UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAITH HIRMUZ, LUAI HIRMUZ,
WARDIA HIRMUZ, and KHALIL HIRMUZ,

                Plaintiffs,                              Case Number 05-60293
                                                        Honorable David M. Lawson

v.

CITY OF MADISON HEIGHTS, MADISON
HEIGHTS POLICE DEPARTMENT, TIM
PAWLOWSKI, and CHAD WOLOWIEC,

                Defendants,
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by all the defendants, who have been sued under 42 U.S.C. § 1983 for violating the civil rights of Laith Hirmuz. Hirmuz alleges that he was prosecuted wrongfully in a Michigan court for raping his young cousin. After the first jury to hear the state case was unable to reach a decision, resulting in a mistrial, a second jury acquitted the plaintiff of the charges. He contends in the present lawsuit that the defendants arrested him without probable cause, misled the prosecutor and magistrate to obtain the arrest warrant, and used false evidence to prosecute him when they fabricated a confession by taking advantage of his lack of proficiency in the English language. The plaintiffs also allege that the investigating officers were acting pursuant to the customs, policies, and practices of the city and police department, and the municipal defendant is liable under a theory of municipal and supervisory liability. The defendants argue that the plaintiff's claims are barred by the statute of limitations, collateral estoppel, and qualified immunity, and the plaintiff cannot prevail as a matter of law on his claims. The Court heard oral argument on the motion on December 11, 2006, after which supplemental briefing was

ordered.  The Court now finds that the City of Madison Heights and its police department are entitled to judgment as a matter of law, and the officers are entitled to judgment in their favor on all the plaintiffs' claims except the false evidence claim.  Therefore, the Court will grant the motion in part and deny it in part.

I.

On May 29, 2003, fifteen-year-old Cynthia Nazi and her mother, Hayden Nazi, went to the Madison Heights, Michigan police department to report that both her cousins, Laith Hirmuz and Romel Nazi, had sexually assaulted her.  Cynthia informed defendant Officer Chad Wolowiec that Hirmuz and Nazi raped and sodomized her.  She alleged that the assaultive behavior started when Cynthia was only six years old; Hirmuz and Nazi were seventeen and twenty-three years old when the attacks began.  Defendant Wolowiec took Cynthia's statement.  That was his only involvement in the case.

Cynthia reported that the events initially occurred in Cynthia's Madison Heights residence.  The attacks by Romel Nazi continued when the family moved to Sterling Heights, but Laith Hirmuz did not move to Madison Heights with the family.  Hayden, Cynthia's mother, reported that she brought her daughter to the Sterling Heights and Madison Heights' police departments after Cynthia informed her of the acts.  Cynthia testified at trial that she withheld the information for so long because of the turmoil that would arise if she disclosed her cousins' alleged conduct.

Cynthia told Officer Wolowiec when he initially interviewed her that Romel Nazi raped her two to three times per week from May 1994 to September 2002.  The events occurred, Cynthia said, while her other relatives were asleep.

Cynthia alleged that Laith Hirmuz sexually assaulted her two times at the Madison Heights home some time between May 1994 and September 1995. Cynthia stated that Hirmuz stopped when Cynthia's family moved to Sterling Heights without him. However, Hirmuz states he was not even in the country until December 1994, seven months after this sexual assault supposedly took place, which appears to be corroborated by immigration forms.

The police departments from both Sterling Heights and Madison Heights investigated Cynthia's claims. The Sterling Heights investigation focused on the post-1995 conduct, while Madison Heights focused on the incidents occurring in that City before that date. Cynthia presented consistent statements to both police departments regarding Laith Hirmuz's abusive behavior. She also reported the same allegations to Care House, an institution that counseled Cynthia regarding the alleged abuse. The plaintiffs state that the defendants never interviewed Cynthia after the initial statement she gave to Officer Wolowiec. The plaintiffs further allege that the defendants failed to interview any of the ten to thirteen other relatives who were living in the house when the assaults allegedly took place and never spoke to the Sterling Heights officers who were also investigating Cynthia's allegations.

On June 10, 2003, defendant detective Tim Pawlowski contacted Laith Hirmuz and Romel Nazi to discuss Cynthia's complaints. Pawlowski also sent letters to them requesting a meeting. On June 16, 2003, both Nazi and Hirmuz came to the police station for interviews. Nazi denied having sexual intercourse with Cynthia at any time in the Madison Heights home. However, he told the detectives that his penis may have touched her buttocks while they were living there because they shared the same bed. Nazi allegedly admitted having anal intercourse with the then ten-year-old Cynthia after they moved to Sterling Heights, but he continued to deny having vaginal sex with

-3-

her because she had to be a virgin for her wedding. According to the detectives, he claimed to have sodomized her two or three times per week for approximately three years. Nazi informed the officers that he could not write in English, so he did not prepare a written statement.

Laith Hirmuz also met with defendant Pawlowski and non-party police detective Gary Kowalski that same day. The officers' notes indicate that Hirmuz was told he was not under arrest and could leave at any time. Pawlowski later testified at a state court hearing that Hirmuz did not exhibit any difficulty understanding English. During the interview, the officers informed Hirmuz of Cynthia's allegations. The officers' report contains the following description of the interview:

> When questioned [Laith] Hirmuz stated that he use to live in Madison Heights some time around 1994 to 1995. . . . Hirmuz stated that . . . he shared a room with Romel, Cynthia, Jessica and Matthew [Cynthia's siblings]. Hirmuz stated that there were two king sized beds in the bedroom that he shared. Hirmuz stated that he often slept in the same bed as Cynthia.

> Sgt. Kowaleski and I advised Hirmuz that Cynthia informed us of two sexual encounters that he had with her. Hirmuz initially denied having any type of sexual encounters with Cynthia. Hirmuz then stated that he did remember on two separate occasions that he did "do some wrong things with Cynthia". Hirmuz stated that on both occasions he put Cynthia to bed earlier than everybody else, because she had school in the morning. Hirmuz stated that he and Cynthia "played around in their bedroom on a bed". Hirmuz said that they were both under the blankets and no one else was in the bedroom with them. Hirmuz states that he was wearing boxer shorts on both occasions. Hirmuz states that Cynthia had her underwear off one time and on the next time. Hirmuz said that when he and Cynthia were lying in bed, she got on top of him. Hirmuz states that Cynthia began rubbing her "butt and vagina area on his penis". Hirmuz stated that they both got excited and his penis got hard. Hirmuz stated that his penis came out of his boxer shorts through the opening in the front. Hirmuz stated "I rubbed my penis in between her butt crack and in between the opening of her pussy lips, but I did not put my penis inside of her pussy hole". Hirmuz stated that this happened on both occasions. Hirmuz stated that he did not ejaculate on either occasion. When asked how he did it the second time when her underwear was on he stated, "she moved her underwear over to one side". Hirmuz indicated this allowed him to place his penis in between Cynthia's buttocks and vagina opening. Hirmuz stated that he was 17 years old and Cynthia was approximately 7 years old when these incidents occurred.

-4-

Defs.' Mot. Summ. J. Ex. 6, OIC Notes.  Hirmuz also signed a written statement, which reads as follows:

> I come to Madison Hts Polic to take about Laith have sex with Cynthia back in 1995 in APT in Madison Hts I was 17 yers oled she was 7 yers oled.  She was [illegible] to bad for schol so I had to go with her Synthia she made move on me she jomp on top of me she got excited so my penis got hard she star rubbing against my penis my penis went between her ass crack then went between her vagina lips this happened twice in one week she did not have untes on one time my penis came through opening in my boxr shorts the second time she moved her panties to one side I rubbed my penis between her butt crack and her vagina crack.

Defs.' Mot. Summ. J. Ex. 8, Narrative Report.  Hirmuz alleges that this statement was fabricated entirely by the police.  The defendants admitted to helping the plaintiff spell some of the words in his written statement, including Cynthia, penis, excited, rubbing, ass crack, vagina, and panties. Pl.'s Resp. Ex. M, Trial Tr. at 73.  For some reason, after Hirmuz made this confession, defendant Pawlowski allowed him to leave the police station, after which Pawlowski submitted his findings to the Oakland County, Michigan prosecutor's office.  Pawlowski explained:

> I know why I didn't arrest him.  I used my discretion.  I felt more comfort [sic] getting a warrant from the prosecutor's office from [sic] a crime that occurred approximately nine years ago.  I was confident that they, if we're talking about Laith at this particular moment, that I was definitely confident when he confessed to us that he committed them, the crime, that he did do them.  I felt more comfortable presenting it to the prosecutor's office and obtaining a warrant.

Defs.' Mot. Summ. J. Ex. 7, *Walker* Hearing Tr. at 30.

Pawlowski never obtained a medical examination of Cynthia or sought any corroborating physical evidence of the sexual assaults.  He presented his findings to the Oakland County prosecutor's office, and on June 23, 2003 a warrant was issued for Hirmuz's arrest.  Romel Nazi left the country before he was arrested, and he was never prosecuted for the alleged crime.

Hirmuz was arrested on June 25, 2003 and arraigned that same day.  He was unable to post bond, which was set at $1 million,  and he remained in custody throughout the proceedings in state court.   Hirmuz  waived  his  right  to  a  preliminary  examination  on  September  3,  2003.   He subsequently obtained a new lawyer, who attempted to revoke the waiver without success.

Meanwhile, on August 5, 2003, the plaintiff was given a polygraph test.  He was asked the following questions:

1.  Has your penis ever touched Cynthia's bare butt?
2.  Has your penis ever been in Cynthia's vagina?
3.  Has your penis ever touched Cynthia's bare vagina?
4.  Is Cynthia telling the truth when she says your penis touched her bare vagina?

Defs.' Mot. Summ. J. Ex. 9, Polygraph Report.  The plaintiff answered "No" to each question.  The polygraph  administrator,  Officer  Valencia  Jones,  concluded  that  the  plaintiff  was  "not  being truthful."  *Ibid*.

On December 8, 2003, the plaintiff filed a motion requesting a hearing to address the issue of whether his confession was involuntary, which is known in Michigan jurisprudence as  a "*Walker* hearing," after *People v. Walker (on reh),* 374 Mich. 331, 132 N.W.2d 87 (1965).  *See Weiner v. Bock*, 387 F. Supp. 2d 717, 725 (E.D. Mich. 2005).  On March 12, 2004, the trial court held a *Walker* hearing; the plaintiff testified, through an interpreter, as follows:

A.  He told me, "do you know why you're here?"  I told him, "no", and then they started to question me.
Q.  What is it that was said to you, do you remember?
A.  He told me in 1994 you slept twice with your cousin and I was . . . baffled.  I didn't know.
Q.  At that point did you feel like you could leave the conference room?
A. I didn't know.  I thought that they were going to take me to the prison.  I was afraid.
Q.  Did you say anything after the police made those statements to you?
A.  I denied all that.  I told them this was a lie.
. . .

-6-

Q. After you made the initial statement that nothing had happened, what happened after that?

A. I was scared, and I started crying and I told them "help me".

Q. Pardon me? I didn't hear that?

A. I told them to "help me".

Q. You asked for help?

A. Yes.

Q. And when you asked for that help, what happened?

A. They changed the charges that you didn't sleep with your cousin but you just like touched her. . . . They told me that we can say that your male organ just touched her and not, that he didn't do any other things.

. . .

Q. (By Ms. Johnson, continuing) Sir, I'm handing you what's been marked and admitted as Defendant's Exhibit A [plaintiff's written statement]. Can you identify that document?

A. I cannot read.

Q. I want you to look at that document. Do you recognize your signature anywhere on it?

A. Yes. My signature is down there.

. . .

Q. Did anyone have to help you write out that document?

A. The whole document, the details in the document is from them, not me.

Q. Are you able to read that document as it appears before you today?

A. It was take [sic] me a long time and I have to spell word by word.

Q. When the officers helped you, did they help you spell out the words?

A. Yes. They helped me.

Q. Did they tell you which letters to write down?

A. Yes. They told me.

Q. Okay. And you wrote down what it was they said for you to do?

A. Yes, because I was ascared [sic] so I have to write what they told me.

Q. Did you feel like at the point when you started writing that statement you could get up and leave any time you wanted to?

A. But when I finished they told me to sign then you can go home.

. . .

Q. Were there any threats made against you?

A. The officer here did not, but the other officer told me, "You're going in prison for a long time if you don't write and sign".

Q. And did you believe that officer?

A. Yes. I was scared.

Q. How did that make you – I'm sorry. I didn't hear that last part?

A. I was scared.

Q. Did the officers ever offer to get an interpreter or someone who spoke Arabic for you so that you could understand what was going on?

A. No.

-7-

Q. Did you ever tell the officers that you didn't understand what was going on, that you needed some help?
A. Yes.
Q. Did the officers ever tell you that you had the right to remain silent?
A. No.
Q. Did they ever tell you that you had a right to ask for an attorney prior to being questioned?
A. No.
Q. Did they ever tell you that anything you say or write down would be used against you?
A. No.
Q. Sir, did you write out that statement freely?
A. They told, because I was scared, they told me you have to write it so the prosecutor can take a look at it so they will reduce the sentence.
Q. At any point from the time you got to the conference room to the time you finished that statement, did you believe you could get up and walk out from the police station?
A. No.

Defs.' Mot. Summ. J. Ex. 7, *Walker* Hrg. Tr. at 65-68, 70-71. The plaintiff here asked the trial court to suppress the written statement as being involuntary. The motion was denied. The trial court judge ruled from the bench:

> So, basically what we have here is an issue of credibility as to the *Walker* issue. The Court does not find that based on the totality of circumstances and considering the total factors that it would be sufficient to suppress the defendant's statements. I think that the facts and the credibility issue is going to be an interesting one for the jury, the trier of fact, but I don't find that it would be something that the Court would utilize to totally suppress the statements as made. I don't believe that they were in fact coerced; although, I do believe that there could be a conclusion that they were, that there was some misunderstanding on the part of the defendant given the language issues, but I don't think it rises to the level of suppression. So, therefore, the defendant's motion is respectfully denied.

Defs.' Mot. Summ. J. Ex. 12, Mot. Hrg. Tr. at 8-9. The plaintiff's first jury trial began on July 29, 2004. The trial ended in a hung jury, prompting a mistrial on August 8, 2004.

Cynthia Nazi apparently was not given a medical examination concerning her allegations until October 1, 2004, after the first trial. The results indicated her hymen was mostly intact. Those

-8-

results appear to have prompted the plaintiff to file another motion to suppress his confession on

October 27, 2004.  He argued this time that the confession was obtained in violation of *Miranda v.*

*Arizona*, 384 U.S. 486 (1966),  because the plaintiff was in custody at the time of the interrogation.

The State also filed a motion to exclude evidence related to the conduct of Romel Nazi with Cynthia

under Michigan's Rape Shield Act.  On November 18, 2004, the court denied the plaintiff's motion

to suppress for the same reasons stated above on June 9, 2004.  The court concluded that the time

for reconsideration had passed and that the plaintiff had not shown palpable error.  The court granted

in part the state's motion to exclude evidence of Romel Nazi's actions

An interlocutory appeal was taken from the state trial judge's order barring reference to

Romel Nazi.  The state court of appeals reversed the order and remanded on November 30, 2004,

with directions to hold an *in camera* hearing to allow Hirmuz to make an offer of proof and argue

why the evidence was necessary to vindicate his constitutional right to confront his accuser.

Presumably as ordered by the court of appeals, the trial judge held another evidentiary

hearing on January 7, 2005.  In addition to more testimony by Cynthia that Nazi had vaginal and

anal sex with her hundreds of times from age six to age fifteen, the results of Cynthia's medical

exam were discussed at the hearing.  Dr. Garfield Johnson, an obstetrician and gynecologist, testified

that although he did not perform the medical examination, he did review the report by the doctor

who examined Cynthia.  Dr. Johnson testified that the findings were inconsistent with Cynthia's

claims that she had been raped repeatedly over a nine year period, and that she was, in fact, a

"virgin."  Defs.' Mot. Summ. J. Ex. 13, Evidentiary Hearing at 56-59.

On January 11, 2005, the trial court issued an opinion commenting on both Laith Hirmuz's confession and the State's attempt to suppress evidence of Romel Nazi's involvement with Cynthia. The court wrote:

> The Court finds that given the fact that this is a suppressed memory case where the alleged victim never made any reference of sexual molestation until approximately 10 years later; both alleged perpetrators, Defendant Hirmuz and absconder Romel Nazi, had alleged sexual contact with the victim during the same time frame (age 6) both perpetrators resided with the victim when she was six and slept in the same bed (approximately 9 related people in one bedroom); the new medical evidence appears inconsistent or at least allows great opportunity for such argument, coupled with the fact that this Court reluctantly allowed the alleged confession of Defendant Hirmuz which was taken by a police officer with no interpreter present despite noticeable language difficulties (the Arabic interpreter has been utilized throughout all proceedings in this Court). It appears clear that the Rape Shield Act either conflicts with the Constitution or has no relevance to Defendant and victim receiving a fair trial under the Constitution of the United States.
>
> Therefore, the Court would rule as it did previously. The jury should not be denied a view of the total circumstances surrounding the alleged confession (the Court could readily have suppressed same) and the alleged allegations as relayed by the victim including those related to the second alleged perpetrator; Defendant Romel.
>
> The Court further notes that limiting testimony and special instructions would be recommended in order to ensure lack of confusion by the jury. However, to preclude any reference to the second perpetrator would appear unjust.

Pl.'s Resp. to Ct. Order Ex. 19, Opinion and Order.

The state prosecutor appealed this decision again, and the Court of Appeals reversed and reassigned the case to a different judge, holding that evidence of Romel Nazi's contact with Cynthia could not be received. The plaintiff appealed the court of appeals decision to the Michigan Supreme Court. On March 25, 2005, the supreme court reversed the decision to assign a new judge to the case but left the rest of the decision intact.

The plaintiff's second trial began on March 29, 2005. He was acquitted by a jury on April 25, 2005 and finally released from custody.

-10-

On December 23, 2005, Laith Hirmuz and some of his relatives filed a ten-count complaint against Cynthia Nazi, the City of Madison Heights, the Madison Heights Police Department, and Officers Tim Pawlowski and Chad Wolowiec.  Also listed as plaintiffs are Luai Hirmuz (brother), Wardia Hirmuz (parent), and Khalil Hirmuz (parent).  The case originally was assigned to the Honorable John Corbett O'Meara, who on January 30, 2006 declined to exercise supplemental jurisdiction and dismissed all the state law claims, leaving only counts three and five.  The only count to make allegation on behalf of Luai, Wardia, and Khalil Hirmuz was count nine, and since this count has been dismissed, these plaintiffs will be terminated from the action.

Count three alleges violations of section 1983 by Officers Tim Pawlowski and Chad Wolowiec based on the theories described above; it also alleges that the City of Madison Heights and the Madison Heights Police Department are liable because the officers were acting pursuant to the customs, policies, and practices of the city and police department.  Count five alleges municipal and supervisory liability against the City of Madison Heights.  The defendants now contend that they are entitled to summary judgment in their favor.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure

-11-

the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary

-12-

judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A.

The defendants first argue that the complaint must be dismissed as time-barred, reasoning that the case is governed by the two-year statute of limitations applicable to false arrest claims. *See* Mich. Comp. Laws § 600.5805. According to the defendants, the claims accrued on June 24, 2003 when the arrest warrant was issued, or perhaps on the date of the plaintiff's interview (June 18, 2003), or the date on which Cynthia's statement was taken (May 29, 2003). The defendants contend that the plaintiffs' complaint was filed on February 2, 2006, more than two years later.

There are two flaws in the defendant's argument. First, the complaint in this case was filed on December 23, 2005, not in February 2006. Second, and more important, the statute of limitations for claims filed in Michigan based on 42 U.S.C. § 1983 is three years, not two years. That is true even if the underlying wrongful conduct stems from a false arrest. (Under state law false

-13-

arrest claims themselves must be commenced within two years.  *See* Mich. Comp. Laws §

600.5805(2)).  In *McCune v. City of Grand Rapids*, 842 F.2d 903 (6th Cir. 1988), the court of

appeals explained:

> In *Wilson v. Garcia*, 471 U.S. 261, 276-280 (1985), the Supreme Court held that the
> appropriate statute of limitations to be applied in all section 1983 actions is the state
> statute of limitations governing actions for personal injury.  Subsequently, in *Carroll
> v. Wilkerson*, 782 F.2d 44, 45 (6th Cir.), *cert. denied*, 479 U.S. 923, 107 S.Ct. 330,
> 93 L.Ed.2d 302 (1986), this court held that Michigan's three year statute of
> limitations for personal injury claims, Mich. Comp. Laws Ann. § 600.5805(8) (West
> 1987), governs section 1983 actions when the cause of action arises in Michigan. . . .
> When the claim is for false arrest, a section 1983 cause of action accrues on the date
> the arrest was made.  *Sandutch*, 684 F.2d at 254; *Singleton*, 632 F.2d at 191.  In the
> instant case, appellant was first arrested in April of 1981.  At this time, he knew or
> had reason to know of the injury which is the basis of his claim of false arrest.  The
> claim of false arrest filed on June 17, 1985, over four years later, is, therefore, barred
> by the applicable three year statute of limitations.

*Id.* at 905-06.

The plaintiffs filed their complaint within three years of Laith Hirmuz's arrest and interview

at which the confession was allegedly fabricated.  The defendant's argument that the complaint is

time-barred must be rejected.

### B.

The defendants next argue the plaintiff fully litigated the constitutionality of his arrest and

the validity of his confession in the criminal proceedings, and he is collaterally estopped from

relitigating those issues in the present case.  "The Full Faith and Credit Act, 28 U.S.C. § 1738,

requires the federal courts to give state court judgments the same preclusive effect that the state

would afford such judgments."  *McCormick v. Braverman*, 451 F.3d 382, 397 (6th Cir. 2006).  For

collateral estoppel to apply in Michigan,

> "(1) 'a question of fact essential to the judgment must have been actually litigated
> and determined by a valid and final judgment'; (2) 'the same parties must have had

-14-

> a full [and fair] opportunity to litigate the issue;' and (3) 'there must be mutuality of estoppel.'" *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 681, 677 N.W.2d 843 (2004) (quoting *Storey v. Meijer, Inc.*, 431 Mich. 368, 373 n. 3, 429 N.W.2d 169 (1988)) (alteration in original and footnote omitted).
>
> As to the mutuality requirement, the *Monat* court held that mutuality was not required when collateral estoppel was being used defensively. . . . In determining whether a party has had a full and fair opportunity to litigate, the *Monat* court instructed that a court should look to the factors set forth in §§ 28-29 of the Restatement (Second) of Judgments. 469 Mich. at 847 n. 2, 678 N.W.2d 425. These sections provide factors that, if found, support the finding that the re-litigation of an issue in a subsequent action between parties is not precluded even though the issue has been actually litigated and determined by a final and valid judgment.

*Gilbert v. Ferry*, 413 F.3d 578, 580-82 (6th Cir. 2005). The defendants bear the burden of proving collateral estoppel applies. *Central Transport, Inc. v. Four Phase Systems, Inc*., 936 F.2d 256, 260 (6th Cir. 1991).

The plaintiff's claim that he was arrested without probable cause is not barred by collateral estoppel because there is no evidence that the issue was "actually litigated and determined by a valid and final judgment." *Gilbert*, 413 F.3d at 580. None of the motions or hearing transcripts submitted by the parties show that the plaintiff litigated the probable cause issue. The defendant has presented no evidence that the plaintiff actually litigated this issue in the criminal proceedings.

The question of the alleged fabricated confession presents a different problem. In Michigan, collateral estoppel applies to bar relitigation of claims raised and determined at a *Walker* hearing when the criminal defendant is convicted. *See People v. Mann*, 89 Mich. App. 511, 514, 280 N.W.2d 577, 578 (Mich. App. 1979). However, although the plaintiff did actually litigate this issue in the criminal proceedings, the plaintiff ultimately was acquitted. A hearing was held on March 12, 2004 at which this issue was discussed, and the trial court judge ruled from the bench, denying the plaintiff's motion to suppress the statement.

Section 28 of the Restatement (Second) of Judgments provides:

-15-

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
>
> (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.

Restatement (Second) of Judgments § 28.  The state trial judge's decision on  the voluntariness of the plaintiff's confession was not appealable because of the plaintiff's acquittal, and collateral estoppel does not apply.  Moreover, the state court judge did not hold that the statement was voluntary.  She merely held that there was a credibility issue to be determined by a jury.  Indeed, the criminal trial judge's ruling itself suggests that it did not have preclusive effect since she held that the issue could be relitigated before the jury.  The jury's acquittal suggests that it did not accept the validity or accuracy of the confession.  Although the jury's determination does not preclude the defendants from relitigating the confession issue in this lawsuit, *see Nali v. City of Grosse Pointe Woods*, 2006 WL 2042379, *5 (E.D. Mich. 2006), it would be ironic to conclude that the state litigation precludes the fabricated evidence claim in this case that is consistent with the state court results.

The plaintiffs' claims are not barred by the doctrine of collateral estoppel.

## C.

The defendants also argue that the undisputed facts show that the plaintiff was not deprived of his constitutional rights because Cynthia's statement alone establishes probable cause for the plaintiff's arrest, and there was no police misconduct that "shocked the conscience" contributing to Hirmuz's voluntary confession.

To prevail on his section 1983 claim, the plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States."

-16-

*Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). There is no challenge to the proposition that the defendants were acting under color of law. However, as noted, the defendants contend that no Fourth Amendment violation occurred in the arrest and prosecution of the plaintiff. The Court will examing each alleged violation against the evidence presented.

1.

As for the absence of probable cause claim, the plaintiffs allege that the defendants had reason to doubt Cynthia's statement at the time of the arrest because, they assert, Cynthia's various reports to authorities were inconsistent. That argument does not appear to be born out by the record in this case.

Of course, the Fourth Amendment prohibits the arrest of an individual without probable cause. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005). Probable cause to arrest exists when "the facts and circumstances within [police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [an arrestee] had committed or was committing an offense." *St. John*, 411 F.3d at 768-69. Courts must "assess the existence of probable cause from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citations omitted).

In *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999), cited by the defendants, the Sixth Circuit held that a victim's sexual assault complaint, "standing alone," is sufficient probable cause for an arrest unless the officers have reason to doubt the veracity of the complaint. The court explained:

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. . . . An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was

-17-

> lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. . . .  This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity. . . .
>
> Thus, [the rape victim]'s accusation that she had been sexually assaulted by Ahlers, standing alone, was sufficient to establish probable cause, especially when bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred.  It appears, then, that in order to sustain their claim that there are genuine issues of fact regarding the existence of probable cause, Plaintiffs would have to allege that the Defendants had reason to think that Stiltner's eyewitness identification was in some way untruthful or unreliable.  Plaintiffs, however, put forth no such allegations.  In fact, prior to Ahlers's arrest and up until immediately before the preliminary examination, Stiltner had relayed her allegations to both the Washtenaw County Defendants and to Parsons in a consistent manner.

*Id.* at 370-71 (internal quotes and citations omitted).

The plaintiffs attempt to distinguish this case by pointing to the length of time that passed between the assaults and the police reports.  However, *Ahlers* does not in any way indicate that is a relevant factor, and the reporting delay by itself does not give rise to the suggestion that Cynthia was lying.  The plaintiffs also claim that Cynthia's reports were inconsistent and that was enough to cause the officers to doubt her story.  However, Cynthia's reports were not inconsistent.  She consistently reported that she was assaulted twice by Laith Hirmuz and several times per week by Romel Nazi.

The defendants had probable cause to arrest Hirmuz, and they are entitled to summary judgment on that aspect of his claim under section 1983.

-18-

2.

The plaintiffs also allege that Laith Hirmuz was prosecuted with the use of fabricated evidence, that is, a false confession.  The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law."  This provision is violated by police behavior that shocks the conscience.  The Supreme Court has held:

> Convictions based on evidence obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience" violate the Due Process Clause.  *Rochin v. California*, 342 U.S. 165, 172, 174 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping).  *See also Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (reiterating that evidence obtained through conduct that "'shock[s] the conscience'" may not be used to support a criminal conviction).  Although *Rochin* did not establish a civil remedy for abusive police behavior, we recognized in *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), that deprivations of liberty caused by "the most egregious official conduct," *id.*, at 846, 847-848, may violate the Due Process Clause.  While we rejected, in *Lewis*, a § 1983 plaintiff's contention that a police officer's deliberate indifference during a high-speed chase that caused the death of a motorcyclist violated due process, *id.*, at 854, we left open the possibility that unauthorized police behavior in other contexts might "shock the conscience" and give rise to § 1983 liability.  *Id.*, at 850.

*Chavez v. Martinez*, 538 U.S. 760, 774 (2003).

Deliberately fabricating evidence against an accused person falls into this category.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  "It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."  *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)); *see also United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) ("knowing use of false or perjured testimony

-19-

constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"); *United States v. Epley*, 52 F.3d 571, 576 (6th Cir. 1995) ("The constitutional rights at issue here are . . . rights under the due process clause of the Fourteenth Amendment to be free from . . . having false evidence presented against him."). "A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

> Although constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. *See, e.g., Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).

*Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

In an analogous case, the Fifth Circuit has held that fabricating evidence in a sexual abuse case involving a child will give rise to liability under section 1983. In *Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999), a four-year-old girl named Hilary was enrolled in a school with a speech therapy program by her parents for treatment of elective muteness. A teacher at the school, Ms. Dearborne, used something called a Facilitative Communicator (FC) with Hilary. Through the FC, Hilary allegedly accused her parents of sexually abusing her. The allegation turned out to be untrue. Dearborne fabricated the accusation, which included words Hilary did not know and could not spell. However, Dearborne contacted the state agency responsible for child protection.

> [A] sheriff's deputy came to Dearborne's classroom. They interviewed the child and observed an FC session, during which it was abundantly clear that Dearborne was producing the messages. Plaintiffs allege that defendants below were incompetent to operate the machine, and that the session was guided by a desire to achieve the result sought by the defendants. The session produced a printout that again

-20-

> implicated the parents, using compound predicates and correctly spelled anatomical terms for genitalia. On the basis of these readouts, the child was removed from her parents' custody, and [Texas Department of Protective and Regulatory Services] initiated a suit to permanently terminate parental rights. Examinations by two physicians revealed no evidence of sexual abuse.

*Id.* at 663. The plaintiffs lost custody of their daughter for three years. The parents, on behalf of Hilary, sued Ms. Dearborne, alleging a violation of section 1983 and substantive due process. The teacher moved to dismiss on qualified immunity grounds. The district court denied the motion and the Fifth Circuit affirmed, stating:

> [W]e conclude that the district court was correct in holding that a teacher's fabrication of sexual abuse against a student's father shocks the contemporary conscience. In effect, Plaintiffs maintain that Dearborne utilized the highly controversial FC device as a tool for concocting her story of child abuse. The device was never intended to be used on a four-year-old child who could neither read nor write, who did not know all of the alphabet and who had no physical impairment. To contend that when such a child was placed on Dearborne's lap in front of the facilitator with Dearborne guiding her hand, she somehow became transformed into a literate person possessed with a rich vocabulary and the ability to express understanding of complex sexual and religious concepts not only defies human experience, it reveals the truth of what was really transpiring. Based on the summary judgment evidence in this record, a rational jury could conclude that the typed words were Dearborne's, not Hilary's and that they revealed the content of Dearborne's mind, not the life experiences of the child. Such behavior is an abusive, irrational, malicious, and oppressive use of governmental power. It is beyond purview that any rational teacher could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed.

*Id.* at 668 (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).

The evidence in this case is conflicting. However, the plaintiffs have brought forth evidence from which a jury could conclude that he did not make a confession, and the testimony that he did was fabricated. Laith Hirmuz testified that he could not write or understand English, and he said that the officers instructed him to write out his alleged inculpatory statement for him and coerced him into signing it. Such an action "shocks the conscience," and this claim will be permitted to go

-21-

forward against defendant Pawlowski. However, it is undisputed that Officer Wolowiec was not present when the confession was taken, and therefore the case against him will be dismissed.

D.

Next, the individual defendants argue that they are entitled to qualified immunity. A police officer is protected by qualified immunity unless "a reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986). Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001), although the Sixth Circuit sometimes expands the inquiry into a three-step sequential analysis, stating: "The first inquiry is whether the [p]laintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 219 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). That court later explained that although the

Supreme Court continues to use the two-step approach, *see Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam), "'the three-step approach may in some cases increase the clarity of the proper analysis.'" *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)).  It appears that when the state actor's conduct is obviously "objectively unreasonable" and violates a constitutional right, the court will "collapse" the last two steps.  *Ibid.* (quoting *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005)).  Where a more exacting analysis of the facts may be necessary, the court tends to employ the third step, since "[i]t is important to emphasize that [the step-two] inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (internal quotes and citation omitted).  However, because the defendants raised the qualified immunity defense, the burden is on the plaintiffs to prove that the defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (holding that "[o]nce the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity").

The Court has found that the plaintiffs suffered no violation of constitutional rights based on the theory that Laith Hirmuz's arrest lacked probable cause.  "Because the plaintiff['s] Fourth Amendment rights were not violated [in that respect] . . . 'there is no necessity for further inquiries concerning qualified immunity.'"  *Causey v. City of Bay City*, 442 F.3d 524, 531 (6th Cir. 2006) (quoting *Saucier*, 533 U.S. at 201).  The same can be said for the fabricated confession claim directed against defendant Wolowiec.

However, defendant Pawlowski is not entitled to qualified immunity on the claim that he fabricated a confession by Hirmuz.  Such behavior violates the constitution and is clearly

established.  "It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."  *Gregory*, 444 F.3d at 737.

E.

Finally, the defendants argue that there is no basis for the claim against the City of Madison Heights or the Madison Heights Police Department.  The plaintiffs respond with the contention that the city has a practice of not training or supervising its police officers properly, and they point to a stipulation entered in the criminal proceedings that the police department has no policy regarding the interrogation of criminal suspects.

Municipalities are considered "persons" within the meaning of section 1983; however, a city "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Rather, municipal liability will be found only when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."  *Id.* at 689.  A municipality also "may be sued for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision making channels."  *Berry v. City of Detroit*, 25 F.3d. 1342, 1345 (6th Cir. 1994).

As the Supreme Court recognized in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), a city can be held liable under section 1983 for failure to train its employees.  However, in order to prevail on a section 1983 "failure to train" claim, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's

-24-

deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the

plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). A municipality can be held

liable for inadequate police training under section 1983 "only where the failure to train amounts to

deliberate indifference to rights of persons with whom police come into contact." *City of Canton*,

489 U.S. at 388. The mere fact that a few officers may be inadequately trained is not sufficient to

demonstrate liability, as the shortcomings could be caused by officer inattention or poor

administration. *Id.* at 391. Allegations that the officers in question could have been better trained

are also insufficient. *Ibid.* Rather, the "failure to train [must] reflect[] a 'deliberate' or 'conscious'

choice by a municipality." *Id.* at 389.

In addition, in Michigan police departments generally cannot be sued in thier own right

because they are not a distinct legal unit apart from the municipality that creates them. As this Court

has noted:

> This case must be dismissed against the City of Romulus Police Department because
> the police department is not a legal entity against whom a suit can be directed.
> *Moomey v. City of Holland*, 490 F. Supp. 188 (W.D. Mich. 1980) (police department
> is merely creature of the city under Mich. Comp. Laws Ann. § 92.1 (West 1991); city
> is real party in interest). *See Michonski v. City of Detroit*, 162 Mich. App. 485, 413
> N.W.2d 438 (1987) (public lighting department is not separate legal entity against
> whom tort action may be brought).

*Haverstick Enter. v. Fin. Fed. Credit*, 803 F. Supp. 1251, 1256 (E.D. Mich. 1992).

The Court finds in this case that the claims against the city and the police department must

be dismissed. The plaintiff has failed to point to a policy or custom that caused his rights to be

violated. The plaintiff has not presented any evidence whatsoever about the training program of the

City of Madison Heights or its police department. The plaintiff therefore is unable to show that the

-25-

training program is so inadequate as to support the claims in his complaint.  Further, as the defendants note, a police department cannot be sued.

III.

The Court finds that there are no claims that remain pending as to plaintiffs Luai Hirmuz, Wardia Hirmuz, or Khalil Hirmuz, and they will be dismissed as parties to the case.  There is no genuine issue of material fact as to the claim of an illegal arrest without probable cause, or any claim as to defendants Chad Wolowiec, the City of Madison Heights, or the Madison Heights Police Department, and summary judgment will be granted in their favor.  The case by plaintiff Laith Hirmuz may proceed against defendant Tim Pawlowski on the theory that creating false evidence – that is, a false confession of guilt – and prosecuting the plaintiff with that evidence violated the plaintiff's rights under the Due Process Clause.

Accordingly, it is **ORDERED** that the complaint is **DISMISSED WITHOUT PREJUDICE** as to plaintiffs Luai Hirmuz,  Wardia Hirmuz, and Khalil Hirmuz, only.

It is further **ORDERED** that the motion for summary judgment by defendants Chad Wolowiec, the City of Madison Heights, and the Madison Heights Police Department [dkt #31] is **GRANTED**, and the complaint against them is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motion for summary judgment by defendant Tim Pawlowski [dkt # 31] is **GRANTED IN PART** and **DENIED IN PART**.  The plaintiffs' claim based on an illegal arrest without probable cause is **DISMISSED**, and plaintiff Laith Hirmuz may proceed to trial on his due process violation claim.

It is further **ORDERED** that counsel for the parties shall appear for a Status Conference to be held at the United States District Court, 231 W. Lafayette Blvd, Chambers 802, Detroit, Michigan

48226 on **Monday January 29, 2007 at 2:00 p.m.** to discuss the schedule for further proceedings in this case.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 3, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means or first class U.S. mail on January 3, 2007.

s/Veverlyn Foster-Sims
VEVERLYN FOSTER-SIMS